## SUPREME COURT.

JOHN MONROE and others agt. JOHN PILKINGTON and others.

WM. B. SCOTT and others agt. SAME.

A *letter of credit* was made and delivered, by the defendants, as follows:—

"*New-York*, 16th *Feb.*, 1856.

Messrs. FLEMING & ALDEN, 94 Wall-street, New-York:
   " *Gentlemen*,—In reply to your communication, made to me this morning, respecting your drawing exchanges upon us, I would state that you have our authority to do so; and all such exchanges drawn upon us will be duly honored and protected. This power, however, is subject to being withdrawn at any future time.
                      " Very truly yours,
                                      " DANIEL PILKINGTON,
               " Of and for the firm of Pilkington Brothers, Liverpool."

*Held*, that this was an open letter of credit, written to Fleming & Alden, to be exhibited to dealers with them, and thus to give credit to them with such dealers.

The defendants could not successfully insist that there was no privity in the contract between them and any persons except Fleming & Alden, and that no other persons could avail themselves of it.

The letter could be of very little service, if, as they contended, the defendants were not to be bound to a third party until they should *accept*. There was no such limitation on the authority—it was, to accept all that the defendants should *draw*, before the power should be withdrawn: the liability of the defendants was complete as soon as the bills were *drawn and negotiated;* and as to such bills could not be withdrawn.

*New-York Special Term, Jan* 1857.
DEMURRER to complaint.
The defendants, on the 16th of February, 1856, delivered to

NEW-YORK PRACTICE REPORTS. 251

Monroe and others agt. Pilkington and others, &c.

Fleming & Alden, merchants in New-York, the following letter:—

"*New-York,* 16th *Feb.,* 1856.

"Messrs. FLEMING & ALDEN, 94 Wall-street, New-York:

"*Gentlemen*—In reply to your communication, made to me this morning, respecting your drawing exchanges upon us, I would state that you have our authority to do so; and all such exchanges drawn upon us will be duly honored and protected. This power, however, is subject to being withdrawn at any future time.

"Very truly yours,

"DANIEL PILKINGTON,

"Of and for the firm of Pilkington Brothers, Liverpool."

Fleming & Alden, for the purpose of more readily negotiating bills, to be drawn under the above letter, deposited it with and showed it to Scott & Co., (plaintiffs in the second suit,) to be shown to any person; and Scott & Co. also showed it to the plaintiffs in the first suit, who, on the faith of it, purchased a draft of Fleming & Alden in August, 1856, for £2,000, Sterling, payable in London at sixty days sight, and drawn on the defendants. They paid for the draft its true value, $9,677.78. Scott & Co., the plaintiffs in the second suit, bought a draft under similar circumstances. The drafts were presented for acceptance; but acceptance was refused, and they were protested. The plaintiffs claim to recover the amount of the face of the bill, with the premium of exchange on London.

The drafts do not go beyond the authority given : there was no restriction as to the amount, the number of days, or the place of payment, although perhaps it is to be inferred that they were to be payable in England, and either at Liverpool or in London, the emporiums of exchange for bills on that country. It, accordingly, is not disputed that Fleming & Alden could sustain an action against the defendants, if they could show any injury to themselves, such as could not be met by a *greater* equity in favor of the defendants. The defendants insist that there was

no privity in the contract between them and any persons except Fleming & Alden, and that no other person can avail himself of it. This turns on the meaning and object of the contract as may be gathered from its face, and the known course of dealing;—whether it was intended as an agreement, in which no one but the defendants and Fleming & Alden should have any concern, or was an open letter, written to them to be exhibited to dealers with them, and thus to give credit to them with such dealers. And, in that inquiry, a controlling *indicium* of intent is, that the article to be dealt in was negotiable paper, intended to circulate from hand to hand, and to transfer a perfect title to each purchaser, for valuable consideration before its maturity, and consisted of *foreign* bills, to be drawn in this country, and to be accepted in another, and which, in the usual course of business, would be sold here before they would be remitted abroad.

By this agreement to accept all bills, to be drawn here by Fleming & Alden, the defendants infused into the letter all the credit which their own house possessed, and led dealers with the latter to believe that they intended that such dealers should rely on this agreement. The defendants also must have perceived that such would be the understanding of others. The letter could be of very little service, if, as contended, the defendants were not to be bound to a third party until they should accept. There was no such limitation on the authority—it was to accept all that the defendants should draw before the power should be withdrawn. The liability of the defendants was complete as soon as the bill was drawn and negotiated, and, as to such bill, could not be withdrawn. Such unlimited discretionary powers must have been given, as an authority to be shown to and acted on by others—that such others might act the more freely without knowledge of any restriction on the powers of the drawers of the bills. It is incredible that there was not some such private restriction, either as to the amount, or the purposes for which the drafts should be drawn, or their time; and it is most likely that it would relate to two, if not to all three of those matters. The unrestricted power could then

have no object, except to be exhibited to the public, and to become an agreement with them also.

When the article thus established in credit is commercial paper, the object is that the additional credit máy accompany such paper wherever it goes; and that the letter may be as current and as negotiable as the principal, to which it is an incident. It is like the certificate "good" on a bank check, and, like that, is intended not only for the use of the one to whom the bank delivers it, but of all who may afterwards accept it. In this it essentially differs from a credit established by one house *on the books* of another in favor of a third person. In that case, all that the last party can ask is, that the second party should give him such credit on his books, and allow him to withdraw the amount of the credit. The *letter* of credit, from its nature in that case, is not to be exhibited to dealers with the third person; nor is he, on the faith of the letter, to draw on the second party. But he is to deposit the letter with the second party, as the authority to the second party for the first, and as affecting them alone; and then, if he receives an acknowledgment from the second party of the credit, on the strength of that he may draw: that is, an instrument affecting the second and third party alone—it is between the borrower and lender only, and not affecting the first party.

Of this last class was *Burkhead* agt. *Brown, &c.*, (5 *Hill*, 634, *affirmed* 2 *Denio*, 375.) There Brown Brothers & Co., of New-York, wrote to their house in Liverpool, stating that at the request of S. & T., and on their account, they begged leave to open a credit for £10,000, in favor of J. D., to be negotiated by him at Rio Janeiro, by drafts on the Liverpool house at sixty days sight; that the latter house would keep S. & T. advised as to the credit used, who would attend to placing them in funds.

The first thing to be done by J. D., on that letter, was to transmit it to the Liverpool house, *there to remain* in their private coffers, as evidence of their authority to charge the New-York house with the £10,000, on crediting that amount to J. D. The purposes of the letter ended when this was done: it

Monroe and others agt. Pilkington and others, &c.

was not to be shown to strangers; it was not intended to give J. D. credit with strangers, but with one single firm, the Liverpool house, and to enable him to obtain credit with that firm alone. Then, after that house should agree to the terms proposed in the letter, he would have the credit of that house, and could draw accordingly; but could not affect the New-York house : their letter was *functus officio* when the credit was established in Liverpool.

Of the former class are *Russell* agt. *Wiggin*, (*quoted* 5 *Hill*, 644, 645; *see it also in* 2 *Story*, *C. C. R.* 213,) and the *Union Bank of Louisiana* agt. *Coster's Executors*, (3 *Com.* 203.) In the last case H. & C. of New-York, sent a letter to K. & Co. of New-Orleans, as follows:—

" Sir—We hereby agree to accept and pay, at maturity, any draft, or drafts, on us at sixty days, issued by K. & Co. of your city, to the extent of $25,000, and negotiated through your bank.

" H. & Coster."

Below this was the following guaranty :—

" I hereby guaranty the due acceptance and payment of any draft issued in pursuance of the above credit.

" J. G. Coster."

The Union Bank of Louisiana, on the faith of these instruments, bought a draft of $4,000, drawn by K. & Co., which H. & Coster refused to accept. The letter and guaranty had before been held by another bank; yet the Union Bank was allowed to recover against the executors of J. G. Coster, the guarantor on the guaranty—which was made thus to travel with each draft of K. & Co., drawn on the faith of it, and to become a separate contract with each person who paid for such draft on the faith of the guaranty.

Justice PRATT uses language from which it might be supposed that the distinction between a special letter of credit and

a general one turned upon the fact, whether it was *addressed*, -in form, to a single individual, or to any and every person. But he used the word " addressed " there as equivalent to "intended for."

In the case before him, the letter was addressed to " Sir," alone, and was sent to K. & Co. alone ; and he says, what explains that case, and the rule intended, and applies to this case, (*p*. 215,)—" The letter of credit in this case was *evidently intended* to be general. It did *not* contemplate a *single* transaction, or draft for the whole amount, but several drafts, limited in the aggregate to $25,000. Although the address " sir," and " your bank," is in the singular number, yet I think it was *intended* to be used in a distributive sense, and apply *to any bank, or banks, who should purchase the drafts*. I can see no object which the drawers should have for limiting the party for whose benefit the letter was issued to a single bank. It is said that it would enable them more readily to revoke the authority. But *these letters are not issued without either undoubted confidence in the persons for whose benefit they are drawn, or upon ample security*." Often they are issued that the drawers may act as the agents of the drawee, as in *Bank of Michigan* agt. *Ely*, (17 *Wend*. 508.)

So if one fraudulently recommends, by letter, another as in good credit, it is immaterial whether the letter be addressed to the purchaser himself, or to a single merchant, or to merchants generally, a separate cause of action arises in favor of each who is defrauded. (*See Addington* agt. *Allen*, 11 *Wend*. 374.) Such would also be the case if, instead of being a false representation, it was a guaranty of goods to be purchased, without limiting the liability to purchases made at a particular house.

Justice PRATT divides general letters of credit into two kinds: 1st. Those that contemplate a single transaction; 2d. Those that contemplate an *open and continued credit, embracing several transactions*. It is evident this case belongs to the second class, and in that class he says the letters of credit " are not generally confined to transactions with a single individual ; but if the nature of the business, which the letter of credit was in-

tended to facilitate, requires it, different individuals are authorized to make advances upon it, and it then becomes a several contract with each individual to the amount advanced by him." He illustrates this by a general letter of credit to a merchant to purchase goods in the city of New-York for a country store. Certainly, it would be determined whether such a letter was a contract with each seller, or with only the one to whom it was addressed—not by looking merely to see whether it was, in form, addressed to one individual, or to "all to whom it might concern," but by looking whether it agreed to guaranty all purchases which the bearer of the letter should make, or all which he should make of some particular house. (*See also Parker* agt. *Gould*, 2 *Wend.* 545, *affirmed* 5 *id.* 414.)

This letter seems precisely such a one as one of our produce dealers might give to his agent, to enable him to purchase, on good terms, on his credit; or as a Liverpool merchant, wishing to buy largely of our cotton, flour, or provisions, would give to his agent here for the like purpose.

It was stated, in argument, that by the present law of England such a letter would give no cause of action, except to Fleming & Alden, and that it would be considered that there was no privity between the defendants and any other persons. If that were so, and this case was to be governed by the English law, the court could not, on demurrer, take notice of an interpretation of the common law peculiar to England. The general term of this court (at its last session, in *Wright* agt. *Berrian,*) expressed its views on the question how far we would assume a law of another state to be the same as ours. Where we know historically that the common law does prevail, there is common sense in assuming that it is the same as ours, although it would be a great strain on one's reasoning powers to infer that the statute law was the same. But then we must also assume that our construction of the common law, as sanctioned by our highest authority, is correct, and, until the contrary is proved as *matter of fact*, that the same is understood to be the law in England and other states, where the common law prevails.

Blackwell agt. Wiswall.

The action here is founded on all the facts of the case—if the acts of the defendants do not amount to an actual acceptance, then they amount only to an agreement to accept—(whether made with Fleming & Alden alone, or with these plaintiffs also)—and then the contract is not to be governed by the laws of England, but by our law: for that contract was made here, and, as a contract, was complete here.

As Justice STORY said, in an analogous case, (*Townsley* agt. *Sumwell*, 2 *Pet. R.* 181,) where the agreement was made in Kentucky to accept drafts in New-Orleans, " The contract for the acceptance and honor of the present bill was (if made at all) made in Kentucky, and was to be governed by its laws; even supposing that the question, whether it amounted to an acceptance or not, was to be governed by the law of Louisiana, where the contract was to be executed."

If the agreement can operate by our laws as an acceptance, it is a present acceptance in this place as soon as the draft is bought on the faith of the agreement, although it is to be paid in England.

The demurrer must be overruled, with costs—with leave to defendants to elect to answer on payment of costs.